1  Michael A. Vanic (CA State Bar # 073486
   **REISH LUFTMAN REICHER & COHEN**
2  11755 Wilshire Boulevard, 10th Floor
   Los Angeles, California 90025-1539
3  Telephone Number: (310) 478-5656
   Facsimile Number:  (310) 478-5831
4  E-mail: mikevanic@reish.com

5  Kathryn J. Halford (CA State Bar # 68141)
   **WOHLNER KAPLON PHILLIPS**
6  **YOUNG & CUTLER**
   15456 Ventura Boulevard, Suite 500
7  Sherman Oaks, California 91403
   Telephone Number: (818) 501-8030
8  Facsimile Number:  (818) 501-5306
   E-mail: kjhalford@wkpyc.com
9
10 Attorneys for Defendants South Bay Teamsters Health
   and Welfare and Related Benefits Trust Fund;
11 Rick Middleton; Bob Doss; Ronn English; and Perri Newell

12              **UNITED STATES DISTRICT COURT**

13              **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 14 TRUSTEES OF THE SOUTHERN CALIFORNIA BAKERY DRIVERS SECURITY FUND; DIRK GEERSEN | CASE NO.:  CV-03-5550-R<br>*Honorable Manual L. Real* |
| 15 | |
| 16              Plaintiffs, | **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR** |
| 17          vs. | **SUMMARY JUDGMENT OR SUMMARY ADJUDICATION OF** |
| 18 RICK MIDDLETON; JOHN ALFORD; PAUL KAYE; BOB DOSS; RONN ENGLISH; PERRI NEWELL; SOUTH | **ISSUES REGARDING AFFIRMATIVE DEFENSES** |
| 19 BAY TEAMSTERS AND EMPLOYERS HEALTH AND WELFARE AND | Date:     August 4, 2008 |
| 20 RELATED BENEFITS TRUST FUND, | Time:    10:00 a.m.<br>Ctrm:     8 |
| 21              Defendants. | Trial Date: August 26, 2008 |
| 22 | Final Pre-Trial Conference: |
| 23 | August 11, 2008 |

24        Defendants South Bay Teamsters Health and Welfare and Related Benefits

25 Trust Fund, Rick Middleton, Bob Doss, Ronn English, and Perri Newell respectfully

26 submit the following Memorandum in Support of their Motion for Summary

27 Judgment, or in the Alternative, Motion for Summary Adjudication of Issues

28 Regarding Affirmative Defenses.

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................. 1

    A.    Preliminary Statement ................................................. 1

    B.    Statement of the Case. ............................................... 1

        1.    The Facts. ...................................................... 2

        2.    The Action. .................................................... 5

        3.    The District Court's ruling, granting Summary Judgment. ...................... 6

        4.    The Court of Appeals' decision. ................................ 8

II.    ARGUMENT ................................................................. 10

    A.    Legal Principles Regarding Summary Judgment Motions ................... 10

    B.    Any Claim For Fiduciary Breach By Failing To Apply The Surplus Funds Exclusively For The Benefit Of The Common Participants Accrued For The Purpose Of ERISA's Statute Of Limitations Either On The Parties' Entry Into The Trust-To-Trust Agreements Or No Later Than On The Receipt And Conversion Of The Monthly Premium/Contribution Payments, And Therefore, The Claim Is Barred By ERISA §413(2). ............................................... 11

        1.    The quandary created by the Court of Appeals does not adversely affect South Bay Trust statute of limitations defenses. ........................................... 12

        2.    Under *Ziegler* and *Phillips*, the three year prong of statute of limitations under ERISA § 413(2) *completely* bars Plaintiffs' breach of fiduciary duty claim. ......................... 15

            a.    The claim accrued either on entry into the Trust-to-Trust Agreements or upon receipt of the payments or contributions. .................................. 15

            b.    The claim is barred because Security Fund had actual knowledge of the breach more than three years before it filed. ................................... 20

        3.    Even if *Phillips* is not given effect, the 3 year statute under *Ziegler* would bar any claims for breach of fiduciary duty related to any breach which occurred before August 4, 2000. ............... 22

  C.  If Not Barred By ERISA § 413(2), The Six Year "Outer Limit" Prong Of The Statute Provides An Absolute Bar To Any Claim Related To Amounts Paid-In To South Bay Trust  Prior To August 4, 1997. ........................................................................................ 23

  D.  The Claim Is Barred By The Equitable Doctrines Of Laches............................. 23

  E.  The Claim is Barred By Equitable Doctrine of Unclean Hands. ......................... 24

III.  CONCLUSION ........................................................................................... 25

# TABLE OF AUTHORITIES

Page

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986).................................................................... 10

*Beck v. Pace Int'l Union,*
127 S. Ct. 2310 (2007).................................................................. 14

*Bristish Motor Car Distributors, LTD v. San Franciso Automotive Industries Welfare Fund,*
882 F.2d 371 (9th Cir. 1989)......................................................... 14

*British Airways Bd. v. Boeing Co.,*
585 F.2d 946 (9th Cir. 1978)......................................................... 10

*Castro v. U.S.,*
540 U.S. 375 (2003)..................................................................... 15

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)..................................................................... 10

*Chao v. Malkani,*
452 F.3d 290 (4th Cir. 2006)......................................................... 17

*Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.,*
474 F.3d 463 (7th Cir. 2007)......................................................... 14

*Chitkin v. Lincoln Nat. Ins. Co.,*
879 F.Supp. 841 (S.D.Cal. 1995) ................................................. 25

*Concrete Pipe & Prods. v. Construction Laborers Pension Trust,*
508 U.S. 602 (1993)..................................................................... 14

*DeFazio v. Hollester Employee Share Ownership Trust,*
406 F.Supp.2d 1085 (E.D.Cal. 2005) ........................................... 20

*DeFazio v. Hollister Employee Share Ownership Trust,*
406 F.Supp.2d 1085 (E.D.Cal. 2005) ........................................... 19

*Ellenburg v. Brockway, Inc.,*
763 F.2d 1091 (9th Cir. 1985)....................................................... 25

*Ganley v. County of San Mateo,*
2007 WL 902551 (N.D. Ca. 2007) ............................................... 25

*Hughes Aircraft Co. v. Jacobson,*
525 U.S. 432 (1999)..................................................................... 14

*IT Corp. v. General American Life Insurance Co.,*
107 F.3d 1415 (9th Cir. 1997)......................................................... 9

*John Hancock Mutual Life Insurance Co. v. Harris Trust & Savings Bank,*
  510 U.S. 86 (1993)........................................................................................7, 9, 12

*Landwehr v. DuPree,*
  72 F.3d 726 (9th Cir. 1995)............................................................................... 23

*Leslie Salt co. v. U.S.,*
  55 F.3d 1388 (9th Cir. 1995)............................................................................. 15

*Local 144 Nursing Home Pension Fund v. Demisay,*
  508 U.S. 581 (1993)........................................................................................... 14

*LTD v. San Francisco Automotive Industries Welfare Fund,*
  882 F.2d 371 (9th Cir. 1989)............................................................................. 14

*M&R Inv. Co. v. Fitzsimmons,*
  685 F.2d 283 (9th Cir. 1982)..................................................................17, 18, 19

*Messenger v. Anderson,*
  225 U.S. 436, 444 (1912)................................................................................... 15

*Phillips v. Alaska Hotel and Restaurant Employees Pension Fund,*
  944 F.2d 509 (9th Cir. 1991)........................................................................20, 22

*Pisciotta v. Teledyne Industries, Inc.,*
  91 F.3d 1326 (9th Cir. 1996)............................................................................. 20

*Pisciotta v. Teledyne Industries, Inc., supra,*
  91 F.3d at 1332.................................................................................................. 22

*Precision Inst. Mfg. Co. v. Automotive Maintenance Mach. Co.,*
  324 U.S. 806 (1945)........................................................................................... 25

*Rodrigues v. Herman,*
  121 F.3d 1352 (9th Cir. 1997)........................................................................... 17

*Schulist v. Blue Cross of Iowa,*
  717 F.2d 1127 (7th Cir. 1983)........................................................................... 13

*Trustees For Alaska Laborers-Construction Industry Health and Security Fund v. Ferrell,*
  812 F.2d 512, 518 (9th Cir. 1987)..................................................................... 24

*Trustees of Southern California Bakery Drivers Security Fund v. Middleton,*
  474 F.3d 642 (9th Cir. 2007)......................................................................passim

*Williams v. Williams,*
  50 F.Supp.2d 951 (C.D. Cal. 1999)................................................................... 10

*Wright v. Nimmons,*
  641 F.Supp. 1391 (S.D.Tex 1986)..................................................................... 17

*Ziegler v. Connecticut General Life Ins. Co.,*
  916 F.2d 548 (9th Cir. 1990)......................................................................passim

*Ziegler v. Connecticut General Life Ins. Co.*,
   916 F.2d 548, 551-52 (9th Cir. 1990) ............................................................ 20

**Statutes**

**29 Code of Federal Regulations §**

2510.3-101(a)(1) ............................................................................................... 12

**29 U.S. Code §**

1002(21)(A) ........................................................................................................ 9

1002(37)(a) ......................................................................................................... 1

1024 ................................................................................................................... 4

1101(b) ................................................................................................... 7, 9, 12

1101(b)(2) ...................................................................................................... 7, 9

1101(b)(2)(A) ..................................................................................................... 9

1104(a) ............................................................................................................. 19

1104(a)(1) ....................................................................................................... 6, 9

1113 ......................................................................................................... 1, 11, 23

1113(a)(2) ......................................................................................................... 20

1132(g)(1) .......................................................................................................... 8

1002(1) ............................................................................................................... 1

1104(a)(1)(A) ................................................................................................... 17

11004(a)(1)(B) ................................................................................................. 17

1106(a)(1)(D) ................................................................................................... 19

1106(b)(1) ........................................................................................................ 17

1113(2) ............................................................................................................. 20

**Employee Retirement Income SEcurity Act of 1974 ("ERISA") §**

3(37)(A) ............................................................................................................. 1

401(b) ........................................................................................................... 7, 12

401(b)(1) .......................................................................................................... 12

401(b)(2) ............................................................................................................ 7

404(a)(1)(B) ........................................................................... 17

406(a)(1)(D) ........................................................................... 17

413 .................................................................................15, 23

413(1) ..................................................................................... 23

502(g)(1) ................................................................................... 8

3(1) ........................................................................................... 1

404(a)(1)(A) ........................................................................... 17

406(a)(1)(D) ........................................................................... 17

104 ........................................................................................... 4

3(21)(A) ................................................................................... 9

404(a)(1).............................................................................6, 18

406 ......................................................................................... 18

406(b)(1) ............................................................................... 17

413(1) ....................................................................................... 1

413(2) ...............................................................1, 11, 20, 21

413(2) ....................................................................................... 1

**Federal Rules of Civil Procedure**

56(c) ....................................................................................... 10

56(d) ....................................................................................... 10

56(e) ....................................................................................... 10

**Other Authorities**

DOL Advisory Op. 92-02A................................................... 13

Ninth Circuit Rules that Businesses Doing Business with Multiemployer Plan Must Return Profits from Such Business Dealing to the Plans, R. Eccles & D. Gordon.......................................8, 15

**Treatises**

California Practice Guide, *Federal Civil Procedure Before Trial* [TRG 2008],

Summary Judgment §14:141 ................................................. 10

# I.   INTRODUCTION

## A.   Preliminary Statement

By this Motion, Defendant South Bay Teamsters Health and Welfare and Related Benefits Trust Fund ("South Bay Trust") and Defendants Rick Middleton, Bob Doss, Ronn English, and Perri Newell (collectively the "South Bay Trustees") move for summary judgment on the sole remaining claim of Plaintiffs Trustees of the Southern California Bakery Drivers Security Fund (the "Security Fund") and Dirk Geersen ("Geersen") for breach of fiduciary duty under ERISA.[1]   This Motion is based on Defendants' statute of limitation, laches, and clean hands affirmative defenses.

## B.   Statement of the Case.

This action involves a claim by the Security Fund for reimbursement from the South Bay Trust of the alleged accumulated amount by which the fees or contributions paid by the Security Fund to South Bay Trust pursuant to the terms of written agreements (the "Trust-to-Trust Agreements") for death benefit coverage provided by South Bay Trust to the so-called "Common Participants"[2] exceeded the death benefits paid plus the administrative costs in connection therewith over the 14-year period of the written Trust-to-Trust Agreements.   To the extent the claim is predicated upon an alleged breach of fiduciary duty under ERISA, it is clearly barred by the 3-year prong of statute of limitations set forth at ERISA §413(2), 29 U.S.C. §1113(2) or, alternatively, by the 6-year prong of statute of limitations set forth at ERISA §413(1), 29 U.S.C. §1113(1), and by the equitable doctrines of laches and unclean hands.   As there are no triable issues of material fact regarding these affirmative defenses, they can be determined on summary judgment.

---

[1] South Bay Trust and Security Fund are both multiemployer welfare plans within the meaning of ERISA §§ 3(1) and 3(37)(A), 29 U.S.C. §§ 1002(1) and 1002(37)(A) that provide benefits for members of various Teamster Union locals.

[2] "Common Participant" is the designation given to the Security Fund participants on whose behalf it contracted with South Bay Trust for death benefit coverage and who, according to Security Fund's allegations, thereby became participant in South Bay Trust.

1.   **The Facts.** [3]

Over the 14 years of their relationship, South Bay Trust and Security Fund entered into four separate Trust-to-Trust Agreements, pursuant to which South Bay Trust agreed to provide death benefit coverage in the amount of $10,000 for the Common Participants[4] in exchange for Security Fund's payment to South Bay Trust of the amount of $5.50 per active Common Participant per month.[5]  [UF 4-9 Exs. 1-4] The Declaration of Trust for the South Bay Trust specifically authorized such agreements, providing:

> "The Trustees shall have the power to enter into agreements, arrangement or contracts with the Trustees of any other Trust Fund or with any union, for the purpose of providing benefits for the participants of this Trust and/or *those of such other fund* or Union." (Emphasis added.) [UF 37 and Ex. 7]

At the commencement of the Trust-to-Trust relationship, no reserves were transferred from Security Fund to South Bay Trust to fund the benefits for the 3,000 plus active Common Participants.   South Bay Trust simply received the first monthly payment.   There were no provisions in the Trust-to-Trust Agreements whereby South Bay Trust could compel Security Fund to pay more than the $5.50 per participant per month contribution if benefits exceeded contributions received.   Simply stated, South Bay Trust had all the funding risks related to the benefit coverage for the 3,000 plus Common Participants from the first day to the last day of the Trust-to-Trust Agreements.

---

[3] This Statement of Facts is a summary of the facts set forth in Defendants' [Proposed] Statement of Uncontroverted Facts and Conclusions of Law (the "Separate Statement") filed and served concurrently herewith. "UF [No.]" refers to an Uncontroverted Fact set forth in the Separate Statement.  Citations to the appropriate UFs appear at the end of each paragraph.  All Exhibits referred to herein and in the Separate Statement are attached to the Declaration of Michael A. Vanic ("Vanic Decl.") filed and served concurrently herewith.

[4] The Trust-to-Trust Agreements provided also a $10,000 accidental death benefit, a $5,000 or $10,000 dismemberment benefit, a $2,500 death benefit for eligible retirees, and ultimately a $1,000 and $500 death benefit for spouse and eligible dependents, respectively, all for the $5.50 per active participant per month contributions/premium. [*See*: UF 4 and Exs. 1-4]

[5] Prior to the Trust-to-Trust Agreements, Security Fund provided its participants only a $1,000 death benefit through an insurance carrier. [*See*: UF 7]

[UF 17,23,27,30, Exs. 1-4] The term of the initial Trust-to-Trust Agreement was for three years, commencing on August 1, 1987 and ending on July 31, 1990. Thereafter, the parties renegotiated the Trust-to-Trust Agreement in 1990, 1993 and 1996, and then renewed the 1996 Agreement annually in 1997, 1998, 1999, and 2000. These subsequent Agreements contained certain benefit enhancements (*e.g.*, the spousal and dependent coverages), but all continued the fixed $5.50 per Common Participant per month fee in exchange for the coverages provided. [*See*: UF 5 and Exs. 1-4]

   As noted, by their terms, the Trust-to-Trust Agreements set a fixed premium or contribution rate.  They did <u>not</u> require South Bay Trust to segregate the payments or contributions received from Security Fund, nor did they require South Bay Trust to maintain a reserve for Security Fund or the Common Participants or to account to Security Fund for any alleged excess or surplus calculated by subtracting from the amount of contributions received the benefits paid and the cost of administration. Finally, in this regard, the Trust-to-Trust Agreements did <u>not</u> require South Bay Trust to refund, reimburse or to pay over to Security Fund at the end of the Trust-to-Trust Agreements or at any other time, the alleged surplus. [*See*: UFs 18-34 and Exs. 1-4]

   Consistent with the Agreements, for 14 years, South Bay Trust provided the death benefit coverage for the Common Participants and paid all benefit claims and costs of administration.  Consistent with the Agreements and the multiemployer plan principles governing it, for 14 years, South Bay Trust placed the premiums or contributions it received from Security Fund into South Bay's pooled accounts along with all other contributions and payments it received.  Consistent with the Agreements and the multiemployer plan principles governing it, during those 14 years, South Bay Trust also treated all contributions and payments once received by it, including those received from Security Fund, as *South Bay's assets* on its books and records, audited financial statements and Form 5500 filings.  Thus, from its pooled accounts, wherein the contributions or payments from Security Fund and others were placed, South Bay Trust (i) paid claims of *all* of its participants – not merely the Common Participants – where

South Bay Trust self-funded the benefits (*e.g.*, death benefit claims and legal defense claims), (ii) paid *all* South Bay Trust Plan expenses (*e.g.*, insurance premiums where it insured the benefit such as its health care benefits, and all Plan administrative fees and expenses of every kind) and (iii) made *all* South Bay Trust Plan investments.  South Bay Trust also relied on the performance of its investments and self-funded benefit plans (like the death benefit plan) in making decisions regarding its investments and the nature, scope, extent and costs of its benefits. [*See*: UF 45, 60-61]

Correspondingly, consistent with the Trust-to-Trust Agreements, for 14 years Security Fund paid the $5.50 per month per participant premiums or contributions to South Bay Trust, treating those payments as expenses on it books, records, and financial statements.  Similarly, consistent with the Agreements, Security Fund *never* asserted that South Bay Trust was required to segregate the payments it made, it *never* requested an accounting from South Bay Trust for the alleged surplus or the investment of the alleged surplus, and it *never* asserted it was entitled to a refund, reimbursement or payment over to it of the alleged surplus.  Similarly, Security Fund, itself, never tracked the alleged surplus or kept its own accounting of the accumulation of the alleged surplus.  Significantly, it never booked the alleged surplus as a *Security Fund asset* in its books, records or financial statements and *never reported it as its asset in its annual IRS Form 5500 Annual Return/Report of Employee Benefit Plan, filings mandated by ERISA §104, 29 U.S.C. §1024, which, by law, required it to list <u>all</u> assets*.  [*See*: UFs 38-44, 45-49, 54-56, Exs. 11C, 11D, 11E & 69A]

As noted, Security Fund did not demand a refund or reimbursement of any of the alleged surplus at any time during the 14 year term of the Trust-to-Trust Agreements.  Thus,

- At the conclusion of the first Trust-to-Trust Agreements in July 1990 when, according to Security Fund, the alleged accumulated surplus was $338,988.26, Security Fund did <u>not</u> demand reimbursement of any or all of that amount, did <u>not</u> negotiate a reduction in the $5.50 per participant per

month premium or contribution for the new Trust-to-Trust Agreement and did <u>not</u> report any or all of the surplus as its asset in its Form 5500;

- At the conclusion of the second Trust-to-Trust Agreements in July 1993 when, according to Security Fund, the alleged accumulated surplus was $741,964.42, Security Fund did <u>not</u> demand reimbursement of any or all of that amount, did <u>not</u> negotiate a reduction in the $5.50 per participant per month premium or contribution for the new Trust-to-Trust Agreement and did <u>not</u> report any or all of the surplus as its asset in its Form 5500;

- At the conclusion of the third Trust-to-Trust Agreements in July 1996 when, according to Security Fund, the alleged accumulated surplus was $1,108,571.42, Security Fund did <u>not</u> demand reimbursement of any or all of that amount, did <u>not</u> negotiate a reduction in the $5.50 per participant per month premium or contribution for the new Trust-to-Trust Agreement and did <u>not</u> report any or all of the surplus as its asset in its Form 5500.  [UFs 65-67 & 71]

Indeed, even when Security Fund gave notice terminating the final Trust-to-Trust Agreement on January 29, 2001, Security Fund did <u>not</u> demand an accounting from South Bay Trust and did <u>not</u> demand a refund or reimburse of any of the surplus that allegedly accumulated during the tenure of the Trust-to-Trust Agreements. [*See*: UFs 68-69, 71 and Ex. 44]

In fact, it was not until January 10, 2002, nearly a year after giving notice, that Security Fund decided that it did not like the bargain it had struck on 4 occasions over 14 years, and *for the first time* asserted it was entitled to reimbursement of the alleged surplus.  [*See*: UF 71 and Ex. 44]

### 2.   <u>The Action.</u>

Bakery Drivers Fund filed its initial complaint ***on August 4, 2003***.  The District Court's granted South Bay Trust's Motion to Dismiss the first claim for relief.  In the second claim for relief in the amended complaint ("FAC"), Security Fund alleged:

Pursuant to the Trust-to-Trust Agreements, Security Fund "participants [would] participate in the death benefit plan maintained by South Bay." [FAC ¶10]  The participants of Security Fund "for whom payments were made to the South Bay Trust under the … Agreement thereby became participants of the South Bay Fund," would thereafter be referred to as the Common Participants, and "[i]n all respects, the South Bay Trust treated the Common Participants as its own participants." [FAC ¶¶11-12]

The paid-in contributions exceeded benefits paid plus expenses and was a "Surplus Funds." [FAC ¶15]  The Surplus Funds were "*assets of Security Fund … and remained assets of Security Fund when give to South Bay Trust*," the South Bay Trustees exercised control and management over the disposition of the Surplus Funds and were, therefore, fiduciaries of the Security Fund, and the South Bay Trustees breached a fiduciary duty *owed to Security Fund* under ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A), by "failing to apply the Surplus Funds *exclusively* for the benefit of the Common Participants." [FAC ¶¶20-26 (Emphasis added)][6]

### 3.  The District Court's ruling, granting Summary Judgment.

South Bay Trust also moved for summary judgment on Security Fund's second claim for relief on the grounds that (i) the Trust-to-Trust Agreements established the rights and duties of the parties, (ii) the Trustees of South Bay Trust are fiduciaries *of South Bay Trust*  under ERISA – *not fiduciaries of Security Fund*, (iii) once received, the fees paid by Security Fund to South Bay Trust on behalf of the Common Participants

---

[6] The first claim for relief alleged that the Trustees of South Bay Trust breached their fiduciary duty owed *to South Bay Trust* under ERISA by failing to hold and use the contributions "solely for the purpose of providing benefits to the Common Participants." This claim was dismissed.  Security Fund did not appeal that dismissal. Security Fund's third claim for relief alleged that the South Bay Trust breached certain collective bargaining agreements by failing to use the contributions for the exclusive benefit of the Common Participants in violation of the Labor Management Relations Act.  The Court of Appeals affirmed the District Court's order granting South Bay Trust summary judgment on that claim.  *Trustees of Southern California Bakery Drivers Security Fund v. Middleton*, 474 F.3d 642, 647 (9th Cir. 2007).  As the first and third claims for relief are no longer in issue, they will be discuss no further herein.

became the assets of South Bay Fund, (iv) as a multiemployer employee welfare plan, the assets of South Bay Trust originally derived from fees for the Common Participants could be used by South Bay Trust for the benefit of any of its participants, and accordingly, (v) the use of its assets in that manner did not violate ERISA's exclusive benefit rule.

Security Fund contended that the fees that it paid to South Bay Trust for the benefit of the Common Participants remained assets of Security Fund because the payments did not fall within the scope of ERISA § 401(b)(2), 29 U.S.C. § 1101(b)(2),[7] which exempts the assets of insurers who issue "guaranteed benefit polic[ies]" from the definition of "plan assets," relying on the "free funds" holding of the Supreme Court in *John Hancock Mutual Life Insurance Co. v. Harris Trust & Savings Bank*, 510 U.S. 86 (1993), to claim that these fees remained plan assets.[8]

The District Court, the Honorable Edward Rafeedie, presiding, ruled on the cross-motions by means of a one-paragraph order, stating that it denied Security Fund's motion and granted South Bay Fund's motion "[f]or the reasons stated in open court on October 25, 2004."[9]  At that hearing, the District Court rejected Security Fund's contention that this case was governed by *John Hancock*, concluding:

> "The court cannot agree with this contention. The act of holding and investing [another's] money, as it existed in the John Hancock case, has always been understood to give rise to fiduciary duties. *No such relationship existed here*." [S.J. Transcript 6:3-7 (Emphasis added)]

Thereafter, the District Court granted South Bay Fund's motion for attorneys' fees

---

[7] Section 401(b)(2) states, in part: "In the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy, but shall not, solely by reason of the issuance of such policy, be deemed to include any assets of such insurer …"

[8] *John Hancock* involved an annuity investment contract to fund pension benefits.

[9] Copies of said Order (the "S.J. Order") and the Transcript to Proceedings, dated October 25, 2004 ("S.J. Transcript") referred to in the S.J. Order are attached collectively as Appendix A to the Request to Take Judicial Notice ("RTJN") to the Vanic Decl.  The numbers to the left of the colon are references to pages; the numbers to the right, to lines.

1   under ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1).[10]   The District Court found that

2   Plaintiffs "brought this action in bad faith" and that "Plaintiffs pursued an action which

3   had no basis in fact, and which was contradicted by almost every action taken by both

4   parties during the 14-year period the Trust-to-Trust agreements were in

5   effect."Attorneys' Fee Order 3:11-12 and 6:7-9, respectively] The District Court further

6   elucidated the reasoning behind its summary judgment decision, stating:

> "[T]here simply is no support in the record for Plaintiffs' assertion that the Trust-to-Trust agreements contemplate the return of any surplus funds. The concise and unambiguous agreements state only that, in exchange for a fee of $5.50 per month per participant, South Bay will provide $10,000 death and AD&D benefits (or $2,500 for retirees). *No provision creates a reserve fund for any surplus. No provision discusses the return of any, or all, surplus funds. No provision provides for the accounting of funds. There is no discussion of any administrative fee (for South Bay or otherwise). There is no provision that would protect South Bay, which bore the full funding risk, in the event that an unexpectedly big number of deaths created a deficit of funds for providing benefits. Outside the terms of the agreements themselves, there is also no evidence that either of the parties ever contemplated the return of any surplus funds at any point during the course of the agreements.*" [Attorney Fee Order, 3:13-25 (Emphasis added).]

### 4.   The Court of Appeals' decision.

In a decision roundly criticized by the leading ERISA commentators,[11] the Court

of Appeals reversed the summary judgment for South Bay Trust on the ERISA claim.

*See Trustees of Southern California Security Security Fund v. Middleton, supra*, 474

F.3d 642 (hereinafter "*Middleton*").[12]   Disregarding the District Court's finding that

South Bay Trust was not holding and investing Security Fund's assets, as well as the

undisputed fact that South Bay Trust is a multiemployer plan, the Ninth Circuit

---

[10]  Said Order (the "Attorney Fee Order") is attached as Appendix B to the RTJN.  The District Court awarded South Bay Trust over $140,000 in fees.

[11]  *See*: R. Eccles & D. Gordon, *Ninth Circuit Rules that Businesses Doing Business with Multiemployer Plan Must Return Profits from Such Business Dealing to the Plans*, 15(1) ERISA Litig. Rptr. 12, 12-14, a copy of which is attached as Appendix C to the RTJN. Robert Eccles and David Gordon, the Editors of ERISA Litigation Reporter, have gone so far as to write that the Court of Appeals' analysis is "fall[acious]" and that the decision "escapes … comprehension."  *Id.*

[12]  A copy of the *Middleton* decision is attached as Appendix D to the RTJN.

concluded that "South Bay Teamsters[13] was an ERISA fiduciary *of the plan assets of Bakery Drivers [Fund]*," *Middleton*, at 646 (emphasis added).  Relying on *IT Corp. v. General American Life Insurance Co.*, 107 F.3d 1415 (9th Cir. 1997) – a case involving the issue of when a third party administrator functions as an ERISA fiduciary[14] – the Ninth Circuit held that "South Bay Teamsters exercised 'control respecting management or disposition of [the Security… Fund] assets,' by receiving payment or assets from Bakery Drivers that were contributed on behalf of plan participants and then placing those assets into its fund over which it had authority, *inter alia*, to write checks." *Middleton*, 474 F.3d at 646 (quoting 29 U.S.C. § 1002(21)(A)).[15] The Court of Appeals reasoned that "where … the exclusion in [29 U.S.C.] § 1101(b)(2) [governing guaranteed benefit policies] is inapplicable," – as it is here, because South Bay Trust does not meet the definition of an "insurer" contained in 29 U.S.C. § 1101(b)(2)(A) – "all assets paid-in are treated as 'plan assets' and an entity that takes 'actions in regard to their management and disposition must be judged against ERISA's fiduciary standards.'" *Id.*, at 646, quoting *John Hancock*, at 106.

It then concluded that the South Bay Teamsters "breached its [fiduciary] duties under ERISA by failing to apply the surplus funds for the benefit of Bakery Drivers Security Fund participants." *Id*. (citing ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1)).[16]  It remanded the case to the District Court "for further proceedings not inconsistent with

---

[13]  It is unclear from the decision whether the Ninth Circuit meant the South Bay Trust, its Trustees or both when it refers to "South Bay Teamsters."

[14]  In *IT Corp.*, the third party administrator had check writing authority over the *plan's* bank account.  It was not writing checks out of its own account.

[15]  ERISA §3(21)(A), 29 U.S.C. § 1002(21)(A), states in relevant part: "… [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,…."

[16]  ERISA § 404(a)(1) states, in relevant part: "… a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants … and – (A) for the *exclusive* purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; …." (Emphasis added.)

1  this opinion." *Middleton*, at 647.  South Bay Trust's petition for writ of certiorari was

2  denied. *Middleton*, 128 S.Ct. 378 (2007).

## II.   ARGUMENT

**A.   Legal Principles Regarding Summary Judgment Motions**

It is the burden of the party who moves for summary judgment to establish that there is "no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law."  FRCP 56(c); *British Airways Bd. v. Boeing Co.*¸ 585 F.2d 946, 951 (9th Cir. 1978).  "This means that, if the moving party has the burden of proof at trial, that party must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in that party's favor."  *Williams v. Williams*, 50 F.Supp.2d 951, 956 (C.D. Cal. 1999).   Where, as here, the Defendants move for summary judgment based on their affirmative defenses, Defendants have the burden of proof.  California Practice Guide, *Federal Civil Procedure Before Trial* [TRG 2008], Summary Judgment, §14:141.

Once the moving party satisfies this initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings… [T]he adverse party's response … must set forth specific facts showing that there is a genuine issue for trial."  FRCP 56(e) [emphasis added].  The "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing to establish an essential element to that party's case, and on which that party should bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on what a reasonable jury could reasonably find for the plaintiff."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

"If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue." FRCP 56(d).

**B.** **Any Claim For Fiduciary Breach By Failing To Apply The Surplus Funds Exclusively For The Benefit Of The Common Participants Accrued For The Purpose Of ERISA's Statute Of Limitations Either On The Parties' Entry Into The Trust-To-Trust Agreements Or No Later Than On The Receipt And Conversion Of The Monthly Premium/Contribution Payments, And Therefore, The Claim Is Barred By ERISA §413(2).**

ERISA has a specific statute of limitations for breach of fiduciary duty claims. ERISA 413, 29 U.S.C. § 1113, states:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of--
>
> > (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
> >
> > (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

"In considering the ERISA statute of limitations, we have previously stated that '[t]o apply the limitations period, we must first isolate and define the underlying violation upon which … [plaintiff's] claim is founded." *Ziegler v. Connecticut General Life Ins. Co.*, 916 F.2d 548, 550-51 (9th Cir. 1990) ("*Ziegler*").

The only guidance from the Ninth Circuit with regard to the fiduciary claim is that "South Bay Teamsters has a fiduciary duty over [Security Fund] plan assets" because "South Bay Teamsters exercised 'control respecting management or disposition of [… Security Fund] assets' … *by receiving payments or assets* from [Security Fund] that were contributed on behalf of plan participants and then placing those assets into its fund over which it had authority … to write check," and that "it breached its fiduciary duties under ERISA *by failing to apply the surplus funds for the benefit of ... Security Fund participants*." *Middleton*, 474 F.3d at 646 (Emphasis added). Thus, according to the Ninth Circuit, the South Bay Teamsters became fiduciaries immediately upon receipt or the "pa[ying]-in" of the contributions or fees for the death benefits coverage for the

Common Participants under the Trust-to-Trust Agreements, and it breached its fiduciary duty to those participants by not applying the surplus funds for the exclusive benefit of the Common Participants.[17]

When the alleged breach by failing to apply the surplus funds for the exclusive benefit of the Common Participants is examined in light of the facts and circumstances of this case, it is apparent that the breach conceived by the Court of Appeals occurred either on entry into the Trust-to-Trust Agreements or certainly no later than on receipt of the monthly premiums or contributions, which were then immediately, not only commingled with South Bay Trust's assets, but converted by South Bay Trust to its own use for its own benefit.

**1.   The quandary created by the Court of Appeals does not adversely affect South Bay Trust statute of limitations defenses.**

The Defendants do not believe the Court of Appeals was correct in ruling that the payments made by Security Fund remained assets of Security Fund, that South Bay Trust was a fiduciary of Security Fund as a result, and that South Bay Trust breached its fiduciary duty to Security Fund by failing to apply those funds exclusively for the benefit of the Common Participants.  A brief digression regarding these issues is useful because it puts the statute of limitation affirmative defense into the context created by the Court of Appeal's ruling.

ERISA "contains no comprehensive definition of 'plan asset.'" *John Hancock*, 510 U.S. at 89.  The authorities relied upon by the Ninth Circuit, *John Hancock*, ERISA § 401(b), and the plan asset regulation thereunder, are applicable only to plan investments. *See* ERISA § 401(b), 29 U.S.C. §1101(b); 29 C.F.R. § 2510.3-101(a)(1) ("'[t]his section describes what constitute assets of a plan with respect to a plan's investment in another entity").  However, as the District Court correctly concluded,

---

[17] This paraphrased Security Fund's allegation that the South Bay Trustees violated their fiduciary duty to the Security Fund "[b]y failing to apply the Surplus Funds exclusively for the benefit of the Common Participants." [FAC ¶23]

neither the Trust-to-Trust Agreements nor the fees paid to the South Bay Trust were plan investments by the Security Fund. [S.J. Transcript 6:3-6].  Instead, the Trust-to-Trust Agreements and relationship plainly are simply a situation where fees were paid to an independent entity for products and services provided at that fixed, contracted rate.

The Department of Labor ("DOL") has clarified that, outside the context of investments, plan assets should be defined according to basic principles of property and contract law.  Thus, the DOL has explained that:

> "It is the position of the Department that, in situations outside the scope of the plan assets – plan investment regulations (29 C.F.R. § 2510.3-101), *the assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law.* This identification process includes consideration of any contract or other legal instrument involving the plan, including the plan documents. It also requires the consideration of the actions and representations of the parties involved."

*See* DOL Advisory Op. 92-02A, at 3 (Jan. 17, 1992) [emphasis added].[18]

Applying the "ordinary notions of property rights under non-ERISA law," including "consideration of any contract … involving the plan," as directed by the DOL, it is difficult, if not impossible, to reconcile the Ninth Circuit decision.  Security Fund chose to contract with South Bay Trust to provide death benefit coverage for a fixed fee.  By choosing to do so, Security Fund elected not to bear the risk that the contributions might be insufficient to fund the insurance or benefit.   Therefore, under "ordinary notions of property rights under non-ERISA law," any "surplus" contributions or payments remain those of South Bay Trust, the party bearing the risk that the contributions might be insufficient to pay for benefits and administration. *See Schulist v. Blue Cross of Iowa*, 717 F.2d 1127 (7th Cir. 1983) (Fund not entitled to reimbursement of "premium surplus" accumulated over years of contract based on alleged ERISA fiduciary breach where no provision of contract required retroactive rating or refund of any award of premiums paid on basis of experience.); *see, also*: *Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 470-71, 474-76 (7th Cir.

---

[18] A copy of the Advisory Opinion is attached as Appendix E to the RTJN.

2007) (concluding pharmaceutical benefit management company was not a fiduciary with respect to alleged surpluses and rebates that it received from drug manufacturers that were in excess of amounts it had agreed to pass back or rebate to the Fund, holding: "*Given that this scheme was the very deal for which Carpenters bargained at arms' length, Caremark owed no fiduciary duty in this regard.*")

Moreover, as a matter of fundamental ERISA multiemployer plan law payments or contributions to a multiemployer plan made on behalf of a given group of participants are not required to be earmarked, applied or used solely for the benefit of those participants. *See Concrete Pipe & Prods. v. Construction Laborers Pension Trust*, 508 U.S. 602, 605, 639 (1993) ("[t]he contributions … pooled in a general fund [are] *available to pay any benefit obligation of the plan*"); *Local 144 Nursing Home Pension Fund v. Demisay,* 508 U.S. 581, 594 (1993) (Stevens, J., concurring) ("*That some portion of respondents' contributions will go to benefit the employees of other contributors is, of course, in the nature of a multiemployer plan*. Such plans operate … by pooling employer contributions for the joint benefit of all participating employees… *An employer's contributions are not solely for the benefit of its employees or employees who have worked for it alone.*" [internal quotes and citations omitted]); *see, also*: *Beck v. Pace Int'l Union*, 127 S. Ct. 2310, 2319, 2320–2321 (2007) (assets of multiemployer plan can be used to satisfy benefit liabilities of any participant or beneficiary); *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 442 (1999) (surplus returns generated by employee contributions could be applied to other participants who did not make such contributions); *British Motor Car Distributors, LTD v. San Francisco Automotive Industries Welfare Fund*, 882 F.2d 371 (9th Cir. 1989) ("In any such pooled fund … one employer's employees may never need to file a claim and this employer's payments may be used wholly to pay for claims made by a different employer's employees").

Thus, it is clear that South Bay Trust was acting and operating at all times during the tenure of the Trust-to-Trust Agreements in a manner consistent with ERISA multiemployer plan law and the DOL Advisory Opinion guidance regarding plan assets.

As a result, South Bay Trust always acted as if the payments made by Security Fund to South Bay Trust *became and remained* South Bay Trust assets available to pay any benefit obligation or expenses of the plan – not merely those related the Common Participants. Consistent or not with multiemployer plan law and the DOL Advisory, the Ninth Circuit nevertheless determined the payments or contributions made by Security Fund to South Bay Trust did <u>not</u> become the assets of South Bay Trust, they remained the assets of Security Fund and they had to be applied exclusively for the benefit of the Common Participants.[19] However, when this Court applies the holding of *Middleton* in the factual context of the Trust-to-Trust relationship, it is readily apparent that South Bay Trust immediately upon entering into the Trust-to-Trust Agreements or certainly no later than upon receipt of the payments or contributions breach its alleged fiduciary duty to Security Fund by "failing to apply the surplus [exclusively] for the benefit of the Common Participants." Therefore, Security Fund's fiduciary breach claim is barred by the statute of limitations.

2. **Under *Ziegler* and *Phillips*, the three year prong of statute of limitations under ERISA § 413(2) *completely* bars Plaintiffs' breach of fiduciary duty claim.**

a. **The claim accrued either on entry into the Trust-to-Trust Agreements or upon receipt of the payments or contributions.**

---

[19] As Eccles and Gordon explain, "[t]he imprecise wording of *Middleton* make[s] it possible for future plaintiffs to argue that ERISA plans constitute some species of preferred buyer." Eccles & Gordon, supra, 15(1) ERISA Litig. Rptr. at 14. Thus, the decision opens the floodgates for claims that the money paid by ERISA plans to other entities in almost any context remains a "plan asset," and that as a result the parties that enter into contracts with ERISA plans will owe those plans a fiduciary duty. Of course, "[t]his argument should be meritless." *Id.* South Bay Trust respectfully submits that *Middleton* is clearly erroneous and would result in manifest injustice, and therefore, it clearly falls within one of the recognized exceptions to the law of the case doctrine. *See Leslie Salt co. v. U.S.*, 55 F.3d 1388, 1393 (9th Cir. 1995) (The court may reconsider previously decided cases in which there has been an intervening change of controlling authorities, new evidence has surfaced, or the previous disposition was clearly erroneous and would work a manifest injustice). *See, also Castro v. U.S.*, 540 U.S. 375, 384 (2003), citing *Messenger v. Anderson,* 225 U.S. 436, 444 (1912) (Holmes, J.) (" The law of the case doctrine … it simply 'expresses' common judicial 'practice'; it does not 'limit' the courts' power.").

It is useful to put this action in temporal perspective.  It was filed on August 4, 2003.  That date was <u>16 years</u> after the first Trust-to-Trust Agreement was entered into and <u>13 years</u> after it came to a conclusion with an alleged accumulated surplus of $338,988.26.  It was <u>13 years</u> after the second Trust-to-Trust Agreement was entered into and <u>10 years</u> after it was concluded with an additional alleged accumulated surplus of $402,976.16.  It was <u>10 years</u> after the third Trust-to-Trust Agreement was entered into and <u>7 years</u> after it ended with an additional alleged accumulated surplus of $366,607.00.  And, it was more than <u>7 years</u> after the final Trust-to-Trust Agreement was entered into for the first year, <u>6 years</u> after that Agreement was renewed for its second year, <u>5 years</u> after it was renewed for its third year and <u>4 years</u> after it was renewed for its fourth full year.

As the District Court originally noted, based on the unambiguous language of the Trust-to-Trust Agreements, South Bay Trust was <u>not</u> required by the Trust-to-Trust Agreements to reserve, segregate or separately account for the fees or contributions for the Common Fund participants, and it did not do so.  Instead, it was permitted by the Agreements to convert those payments or contributions to its own use and treated them as its own assets, commingling them in pooled accounts from which South Bay Trust paid benefit claims of all participants where South Bay Trust self-funded the benefit (*e.g.*, the death benefits), paid all Plan expenses (*e.g.*, insurance premiums where South Bay Trust insured the benefit and all plan administrative expenses of every kind) and made all Plan investments for its own benefit.

Thus, if the failure to apply the payments for the exclusive benefit of the Common Participants was a breach of fiduciary duty as the Court of Appeals concluded, from the inception of the first Trust-to-Trust Agreement or certainly from no later than the date of receipt of the first monthly payment of $5.50 per participant per month,[20] South Bay

---

[20]  According to Security Fund, there was an excess from the first month in which contributions were made in September 1987 as $35,244 was contributed, an administrative fee of $2,819.52 was incurred but no death benefit was paid.

Trust breached that fiduciary duty by failing to reserve, segregate and account for the funds, commingling them with its assets and using them to pay all benefit claims – not just claims of the Common Participants, using them to pay all Plan expenses – not just expenses related to the Common Participants' death benefits, and using them for South Bay Trust plan investments. *See*: ERISA §§404(a)(1)(A) and 404(a)(1)(B), 29 U.S.C. §§1104(a)(1)(A) and 11004(a)(1)(B), ERISA §§406(a)(1)(D) and 406(b)(1), 29 U.S.C. §§1106(a)(1)(D) and 1106(b)(1);[21] *Rodrigues v. Herman*, 121 F.3d 1352, 1356 & 1356 fn. 4 (9th Cir. 1997) (failure to segregate or earmark is breach of fiduciary duty; the use of plan assets other than for exclusive benefit violates both the exclusive benefit rule and prohibited transaction rules); *Chao v. Malkani*, 452 F.3d 290 (4th Cir. 2006) (breach of fiduciary duty by failing to use plan assets for exclusive benefit of plan and its participants); *Wright v. Nimmons*, 641 F.Supp. 1391 (S.D.Tex 1986) (fiduciary breached by "blatantly disregarding his duty of loyalty by consistently treating the trust assets as if they were his own property"). In short, South Bay Trust *never* applied the surplus exclusively for the benefit of the Common Participants. Instead, it *always* applied the surplus for the benefit of *all* of its participants and its own fund, and therefore, according to the Court of Appeals was always in breach of its alleged fiduciary duty to Security Fund.

Security Fund appears to believe that the statute of limitations did not commence to run until it made a demand for refund in 2002 which was refused. It is clearly wrong. The breach of fiduciary duty claim accrues when the breach first occurs. *Ziegler*, 916 F.2d at 551-52; *M&R Inv. Co. v. Fitzsimmons*, 685 F.2d 283, 287 (9th Cir. 1982).

In *Ziegler,* Plaintiff Westco's pension plan contracted with Connecticut General in August 1983 to invest its pension assets. The contract provided two surrender options

---

[21] ERISA § 406(a)(1)(D) prohibits (i) the transfer to a party in interest of any assets of a plan and (ii) a use of plan assets by or for the benefit of a party in interest. ERISA §406(b)(1) prohibits a fiduciary from dealing with plan assets in his own interest or for his own account.

1   for valuation upon termination, a book value option under which the Plan would receive

2   its assets back over a five year period or a market value option under which the Plan

3   assets would be paid in a lump sum adjusted by a market value formula.  On February

4   15, 1985, the plan terminated, requesting the lump sum option.  On March 5, 1985, the

5   Connecticut General completed the transfer.  Of a then total of $1,089,374 in plan assts,

6   Connecticut General retained $94,104 for its market value adjustment.  On March 1,

7   1988, plaintiffs sued Connecticut General claiming it breached its fiduciary duty under

8   ERISA §404(a)(1) and violated ERISA §406 by taking market value adjustment upon

9   cancellation.   The District Court granted judgment on the pleadings for Connecticut

10  General based on ERISA's 3 years statute of limitations.

11          The Court of Appeals rejected the plaintiffs' claim that the cause of action did not

12  accrue and the statute of limitations did not begin to run until Connecticut General

13  actual took the plan funds by the market value adjustment in 1985.  Noting that the first

14  step in the analysis is a determination of when the alleged breach or violation occurred

15  (*Id.* at 550), the Court held:

16          "As under *M & R Investment's* rationale,[22] plaintiffs need not allege actual
17          injuries to prosecute certain ERISA violations.  Congress intended to make
            fiduciaries culpable for certain ERISA violations in the absence of actual
18          injury to a plan or participant. [Citations omitted]  Indeed plaintiffs need not
            prove any injury in order to prosecute violations of the ERISA provisions
19          that Westco alleges Connecticut General violated.   Under 29 U.S.C. §
20          1104(a) … an ERISA plaintiff may prosecute a plan fiduciary who fails to
            perform for the exclusive benefit of participants … regardless of cost or loss
21          to the participants ….   Likewise, under 29 U.S.C. §1106(a)(1)(D) … an
22          ERISA plaintiff may prosecute a fiduciary's transfer of plan assets to a party-
            in-interest regardless of cost or loss to the plan.
23
24          … [W]e hold that the ERISA breach or violation, if any, occurred in

25  ────────────────
[22] In *M & R Inv. Co. v. Fitzsimmons*, 685 F.2d 283 (9th Cir. 1982), the Court identified
26  the breach of fiduciary duty to be in the contract provision which illegally authorized
    loans to a partying-interest, and concluded that it was unnecessary to wait to the
    disbursement of the loans themselves to identify the ERISA violation, holding that
27  actual injury or harm was not necessary to make an ERISA violation actionable.  "[T]he
    culpability arises with the *contract's creation*."  *Id.* at 287; *see*: *Ziegler* at 551.
28

Westco's case upon execution of the 1983 investment agreement containing the 'market value' option.  As in *M & R Investment*, the alleged breach in Westco's case occurred upon the contract's creation."  916 F.2d at 551.

Here, the Trust-to-Trust Agreements gave South Bay Trust the right to treat the payments or contributions as its own.  They did not require a reserve, sequestration, accounting or the return of any surplus at any time or prohibit utilization of payments or contributions other than for the exclusive benefit of the Common Participants – all of which would have been required in an agreement to hold Security Fund's assets.  Thus, as in *Ziegler* and *M & R Investment*, the breach occurred upon creation of the Agreement.  *See, also*: *DeFazio v. Hollister Employee Share Ownership Trust*, 406 F.Supp.2d 1085 (E.D.Cal. 2005) (claims of breach of fiduciary duty by failing to act in exclusive interest of participants based on stock valuation and prohibited transaction barred by statute of limitations; held: "The ERISA breach or violation, if any, occurred upon the creation and execution of the Plan's Articles of Incorporation, because it is that instrument that provides that JDS may purchase stock from HolliShare and which establishes the stock's book value as the fair market value.')

Moreover, even if the breach did not occur on creation of the Trust-to-Trust Agreements, it is undisputed that South Bay Trust converted the payments or contributions to its own use immediately upon receipt of them by commingling them in its pooled accounts, using them for the payment of *any* benefit claim made by *any* participant (and thus *never* solely for the benefit of the Common Participants) and for the payment of any South Bay Trust plan expenses and for its investments and thus, treating them for all intents and purposes as South Bay Fund's assets.  *See Rodriguez,* 121 F.3d at 1356.  In short, South Bay Trust *never* applied the payments or contributions received from Security Fund exclusively for the benefit of the Common Participants. Thus, at the very latest, the breach occurred upon receipt of the funds.

1

2

                **b.**    **The claim is barred because Security Fund had actual knowledge of the breach more than three years before it filed.**

3

4

5

6

7

8

9

10

11

12

     Where, as here, there is a repetition of the conduct (*e.g.*, taking each payment or contribution and converting it into South Bay Trust's assets) constituting the breach or a "series of breaches … of the same character, "[o]nce plaintiff knew of one breach, an awareness of later breaches would impart nothing materially new." *Phillips v. Alaska Hotel and Restaurant Employees Pension Fund*, 944 F.2d 509, 520 (9th Cir. 1991) ("*Phillips*").  Thus, "[t]he earliest date on which a plaintiff became aware of any breach would … start the limitations period of § 1113(a)(2) running." *Id.  "[I]f the breaches are of the same kind and nature and the plaintiff had actual knowledge of one of them more than three years before commencing the suit, § 1113(a)(2) bars the action."* *Phillips*, at 521 (Emphasis added).[23]

13

14

15

     Accordingly, Security Fund's breach of fiduciary duty claim is *totally* barred if Security Fund had actual knowledge of the breach of fiduciary duty more than 3 years prior to August 4, 2003.  Clearly it did.

16

17

18

19

20

21

22

23

     Actual knowledge is obtained for the purpose or ERISA §413(2) "when a reasonable person should have known of the breach." *DeFazio v. Hollester Employee Share Ownership Trust*, 406 F.Supp.2d 1085, 1093 (E.D.Cal. 2005); *Pisciotta v. Teledyne Industries, Inc.*, 91 F.3d 1326, 1332 (9th Cir. 1996) (the "Plaintiff knows or has reason to know" knowledge requirement of the California statute of limitations "parallels the knowledge requirement contained in the ERISA statute of limitations.").  Here there can be no doubt that Security Fund had actual knowledge for the purpose of ERISA §413(2).

24

25

26

     Security Fund knew that South Bay Trust was <u>not</u> accounting to it for the alleged surplus.  It knew that South Bay Trust was <u>not</u> accounting to it for the investment of the surplus.  It knew that South Bay Trust was a multiemployer plan and that multiemployer

27

---

[23] 29 U.S.C. § 1113(a)(2) is now 29 U.S.C. §1113(2).

28

plans traditionally used pooled accounts into which contributions and payments from all sources are deposited.  Security Fund knew it was treating its payments to South Bay Trust as expenses, and that it was not tracking them as an asset.

With regard to the latter, Security Fund had an affirmative duty to accurately report *all* of its assets to the government in its Form 5500 filings.  During the term of the Trust-to-Trust Agreements, it *never* reported *any* portion of the payments or contributions paid to South Bay Trust or the alleged accumulating surplus as a Security Fund asset. Item 34 of the Form 5500 required Security Fund to list *all* assets and liabilities. Thereunder, 34c(11) requests information regarding "value of interest in common/collective trust; 34c(12) request information regarding "value of interest in pooled separate accounts;" 34c(13) request information regarding "value of interest in master trust;" 34c(14) requests information regarding "value of interest in 103-12 investment entities;" and 34c(17) requests information regarding "other" assets.  Year after year during the Trust-to-Trust Agreements, Security Fund left each item blank. Year after year during the Trust-to-Trust Agreements, Security Fund reported that its only assets were 34a non interest-bearing cash; 34b(1) employer contributions; 34c(1) interest-bearing cash, including money market funds; 34c(2) certificates of deposit; 34c(4) corporate debt instruments; and 34(e) buildings and other property used in plan operations.  Clearly, Security Fund knew South Bay Trust was treating the surplus as South Bay Trust's asset.  Otherwise, it would have demanded the information it needed from South Bay Trust to complete its Form 5500 honestly and accurately.

Security Fund knew all along that South Bay Trust was not applying the payments or contributions solely for the benefit of the Common Participants.  If it was, it would have had to account for the surplus and the investment of that surplus for Security Fund's Form 5500 reporting purposes.  Undoubtedly, ERISA 413(2) has run.

3.   **Even if _Phillips_ is not given effect, the 3 year statute under _Ziegler_ would bar any claims for breach of fiduciary duty related to any breach which occurred before August 4, 2000.**

The Ninth Circuit has expressly rejected the continuing violation theory in ERISA actions.  _See, e.g._, _Pisciotta v. Teledyne Industries, Inc._, _supra_, 91 F.3d at 1332 (citing _Phillips_ and noting that the "ERISA statute requires the plaintiffs knowledge to be measured from the 'earliest date' on which he or she knew of the breach").  In _Phillips_, the Ninth Circuit noted that the "application of a continuing violation theory essentially read the 'actual knowledge' standard out of the statute." 944 F.2d at 520.  However, even if this Court is willing to diverge from the holding of _Phillips_ for some reason to find some form of new and separate breach related to each payment received from the Security Fund, at best, Plaintiffs' claim would be limited to reimbursement of amounts paid-in to South Bay Trust within three years of filing the action (_i.e._, payments made on or after August 4, 2000) – not funds paid in for the full 14 years of the Trust-to-Trust Agreements as Security Fund contends.

The separate concurring opinion in _Phillips_, Judge O'Scannlain made this point clearly, stating:

> "…[P]laintiff insists—and the district court held – that this suit involves allegations of a 'continuing violation' and that the applicable limitations period therefore never expired.  As our opinion correctly points out, however, this argument is overbroad.  … If the 'continuing violation' rationale that we have applied in other contexts were as broad as the plaintiffs nd the district court suggest, the 'actual knowledge' provision in the statute would be superfluous and virtually no breach would ever grow stale so long as it remained unremedied.  The plaintiffs and the district court have confused the failure to _remedy_ the alleged breach of an obligation with the commission of an alleged second breath which, as an overt act of its own, recommences the limitations period. [Citation omitted]   Moreover, _even where a 'continuing violation' does restart the limitations period, it can only preserve those claims allocable to the 'restarted' period; untimely claims are not resuscitated by an invocation of this doctrine_." 944 F.2d at 522-523 (Emphasis added)

1   Consequently, Plaintiffs' maximum potential recovery is for 10 months (August

2   2000 through May 2001) of contributions less 10 months of benefits paid and the related

3   10 months of administrative fees.  That amount is in dispute, but it cannot be more than

4   $139,103.24 based on Security Fund's own calculation.

5   **C.    If Not Barred By ERISA § 413(2), The Six Year "Outer Limit" Prong Of The**
**Statute Provides An Absolute Bar To Any Claim Related To Amounts Paid-**

6   **In To South Bay Trust  Prior To August 4, 1997.**

7   Under the circumstances of this case, it is highly unlikely that the Security Fund

8   could cogently argue a lack of actual knowledge of the alleged breaches triggering the

9   three year statute.  Thus, ERISA § 413(2) will be the operative statute of limitations.

10  However, even if it can argue lack of knowledge necessary to trigger the three year

11  statute, Security Fund nevertheless is still not able to claim recovery of amounts paid-in

12  to South Bay Trust  over the full 14 years of the Trust-to-Trust Agreements since the six

13  year provision of ERISA § 413(1) limits its claims to alleged "surplus" that accumulated

14  within 6 years prior the filing of this action on August 4, 2003.  29 U.S.C. § 1113(1);

15  *see, also*: *Landwehr v. DuPree*, 72 F.3d 726, 733 (9th Cir. 1995) ("In addition to

16  requiring that actions be brought within three years of the date the plaintiff obtains

17  knowledge of the violation, [29 U.S.C.] section 1113 prohibits ERISA plaintiffs from

18  bringing suit more than *six years* after the date of the breach or violation (except in the

19  case of fraud or concealment).  This six-year outer limit on most ERISA actions should

20  adequately protect defendants from untimely claims." [Emphasis by the Court]).

21  Thus, the claim with regard to any surplus benefit prior to August 1997 – six

22  years before the filing of the action – is barred by the six-year "outer limit" of the statute

23  of limitations.  While this amount is also in dispute, it cannot be more than August 1997

24  through May 2001 is $546,530.82 based on Security Fund's calculation.

25  **D.    The Claim Is Barred By The Equitable Doctrines Of Laches.**

26  It is undisputed that the Security Fund never advised South Bay Trust during the

27  14 year tenure of the Trust-to-Trust Agreements that it believed that the South Bay Trust

28  was acting as a fiduciary of Security Fund, that the payments once made to South Bay

Trust somehow remained assets of the Security Fund, or that any portion of the payments made to South Bay Trust by the Security Fund ever had to be returned to the Security Fund.  It is also undisputed that the Security Fund never treated or reported the payments once made to South Bay Trust as assets of Security Fund.  Correspondingly, it is also undisputed that South Bay Trust treated the payments once received as its assets, made its investment decisions on the basis of the full performance of its benefit plans, including the death benefit plan, and spread the risk with regard to the benefits it provided actuarially across the entire spectrum of contributions it received for all participants, including the Common Participants, for all of its welfare benefit plans. There can be no doubt that it would now be severely prejudiced if any substantial amount of the funds upon which it based its decisions over a 14 year period and which were an integral part of its negotiations with Security Fund are now stripped away.[24]  It has no way now, after-the-fact, to make up that loss.

When added to the near interminable delay by Security Fund in asserting its claims, these facts provide a compelling basis for a laches defenses.[25]  *Trustees For Alaska Laborers-Construction Industry Health and Security Fund v. Ferrell*, 812 F.2d 512, 518 (9th Cir. 1987) ("To successfully invoke the defense of laches, an individual must show there was inexcusable delay in the assertion of a known right and that the party asserting laches has been prejudiced.").

**E.      The Claim is Barred By Equitable Doctrine of Unclean Hands.**

Security Fund has come into this Court with unclean hands, which bars its claim. The Ninth Circuit has long recognized the application of the doctrine of unclean hands in the context of ERISA actions.  *See Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097

---

[24] Conversely, it should be noted that the Security Fund has never contended that it has not been able to fund the purchase of insured death benefit coverage for its participants through the continuing contributions of its employers.

[25] To refer to the delay as near interminable is by no means an exaggeration.  Security Fund is asserting this claim with regard to actions that took place under an agreement that was concluded in 1990, an agreement that was concluded in 1993 and one that was concluded in 1996 – 13, 10 and 7 years before its action was filed.

(9th Cir. 1985).  "This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of a court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith." *Chitkin v. Lincoln Nat. Ins. Co.*, 879 F.Supp. 841, 853-54 (S.D.Cal. 1995); *see, also*: *Ellenburg*, at 1097.  "The unclean hands doctrine derives from the equitable maxim that 'he who comes into equity must come with clean hands.'" *Ellenburg*, at 1097, quoting *Precision Inst. Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814 (1945); *see, also*: *Ganley v. County of San Mateo*, 2007 WL 902551, *5 (N.D. Ca. 2007) ("The doctrine of unclean hands generally applies to prevent a party from obtaining equitable relief and profiting from their own misconduct. The defense 'closes the doors of equity' to a party who has acted in bad faith relative to the matter before the court.")

Here, Security Fund has taken the position in this action that the surplus is its asset.  However, for the 14 years of the Trust-to-Trust Agreements, it failed to make such a claim to South Bay Trust through multiple contract negotiations, and more importantly, it deceived the government by failing to report that asset in its Form 5500 filings.  Such conduct can only be described as bad faith or fraudulent.

## III.   <u>CONCLUSION</u>

For all the foregoing reasons, it is respectfully submitted that South Bay Trust motion should be granted.  Security Fund's breach of fiduciary duty claim is barred by the statute of limitations and equitable doctrines of laches and unclean hands.


July 14, 2008                          REISH LUFTMAN REICHER & COHEN


By: _/s/ Michael A. Vanic_
MICHAEL A. VANIC
Attorneys for Defendants South Bay Teamsters Health
and Welfare and Related Benefits Trust Fund, Rick
Middleton, Bob Doss, Ronn English, and Perri Newell

DEFENDANTS' MEM. OF P&A SUPPORTING
MOT. FOR SUMMARY JUDGMENT
398419.2